# In the United States Court of Federal Claims

|  |  |
|---|---|
| IMAGINARIUM, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 22-cv-1453<br><br>Filed:  June 7, 2023 |

*John Robert Grimm*, HWG LLP, Washington, D.C. argued for Plaintiff.  With him on the briefs are *Jonathan O. Hafen*, *Michael S. Anderson*, *Victoria R. Luman*, and *W. Ash McMurray*, Parr Brown Gee & Loveless, P.C., Salt Lake City, UT.

*Patrick Angulo*, United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant.  With him on the briefs are *Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director, Commercial Litigation; *William J. Grimaldi*, Assistant Director, Commercial Litigation; and *Jennifer M. Narvaez*, United States Small Business Administration, Office of General Counsel.

## MEMORANDUM AND ORDER

In December 2020, Congress enacted the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Act).  *See* Pub. L. No. 116-260 §§ 301–48.  Section 324 of the Act established the Shuttered Venue Operators Grant program (SVOG Program).  *Id.* § 324 (codified at 15 U.S.C. § 9009a).  The SVOG Program's purpose was "to provide assistance to eligible live-entertainment businesses impacted by the [COVID-19] pandemic."  Transfer Complaint (ECF No. 48) (Transf. Compl.) ¶ 1.  The Act tasked the United States Small Business Administration (SBA) with administering the SVOG Program.  *See* 15 U.S.C. § 9009a(b)(1)(A).

Plaintiff Imaginarium, LLC is a self-described "small live-event production company" that applied for a grant through the SVOG Program.  Transf. Compl. ¶ 2.  The SBA initially

signaled that Imaginarium's application was approved and a grant would be forthcoming.  *Id.* ¶ 3.  Ultimately, however, the SBA declined Imaginarium's grant application because Imaginarium did not qualify under the SVOG Program's eligibility criteria.  *Id.* ¶¶ 9–13.  After initially filing suit in the United States District Court for the District of Utah, this action was transferred to the United States Court of Federal Claims, where Imaginarium filed a Transfer Complaint.  ECF Nos. 39, 40, 48.  Plaintiff's Transfer Complaint contends that the SBA breached a contract with Imaginarium by denying Imaginarium's SVOG Program grant application.  *Id.* ¶¶ 108–12.  Imaginarium seeks $1,611,445.16, the amount in grant funds it contends it is entitled to receive under the SVOG Program.  *Id.* at 26.[1]

Pending before this Court is Defendant United States' (Defendant's or Government's) Motion to Dismiss for Failure to State a Claim (Motion).  *See* ECF No. 60 (Mot.).  The Defendant urges this Court to dismiss this action for breach of contract pursuant to Rule 12(b)(6) because "Imaginarium's complaint fails to plausibly allege the required elements for a contract with the United States."  Mot. at 9.  The Motion is fully briefed, and this Court conducted oral argument on April 11, 2023.  Having considered the parties' arguments and applicable law, this Court holds that Imaginarium failed to plead facts sufficient to establish the existence of a contract with the United States, and, consequently, Imaginarium's Transfer Complaint fails to state a claim for breach of contract as a matter of law.  Accordingly, this Court **GRANTS** the Government's Motion to Dismiss for Failure to State a Claim (ECF No. 60) pursuant to Rule 12(b)(6).

---

[1] Citations throughout this Memorandum and Order reference the ECF-assigned page numbers, which do not always correspond to the pagination within the cited document.

## BACKGROUND

### I.        The SVOG Program

As part of its effort to lessen the burdens of COVID-related measures on businesses, Congress passed the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, which set aside approximately $15 billion to the SVOG Program.  Pub. L. No. 116-260 § 323(d)(1)(H).  The subsequent American Rescue Plan Act of 2021 added an additional $1.25 billion to the pool of funds available to shuttered venue operators.  *See* Pub. L. No. 117-2 § 5005.

Venue operators impacted by the pandemic could apply for monetary grants through the SVOG Program.  The SVOG Program prescribed eligibility criteria for businesses seeking a grant: only live venue operators or promoters, theatrical producers, live performing arts organization operators, relevant museum operators, motion picture theatre operators, and talent representatives that met certain requirements were eligible for grants.  *See* 15 U.S.C. § 9009a(a)(1)(A).  A business was required, for example, to have been "fully operational . . . on February 29, 2020" and have suffered a 25% decline in gross earned revenue between one quarter in 2019 and the same quarter in 2020.  *Id.* § 9009a(a)(1)(A)(i).  Eligible businesses must also have intended to reopen and resume normal operations when permitted by law.  *Id.* § 9009a(a)(1)(A)(ii).

Additionally, the SVOG Program imposed physical and operational requirements to qualify for a grant.  A live venue operator or promoter, theatrical producer, or live performing arts organization operator was defined as an entity that, "as a principal business activity, organizes, promotes, produces, manages, or hosts live concerts, comedy shows, theatrical productions, or other events by performing artists."  *Id.* § 9009a(3)(A)(i)(I).  Furthermore, the venues at which a live venue operator or promoter "promotes, produces, manages, or hosts

events" must have "[a] defined performance and audience space[,] . . . [m]ixing equipment, a public address system, and a lighting rig," among other required characteristics.  *Id.* § 9009a(a)(1)(A)(iii).  Theatrical producers, live performing arts organization operators, motion picture theatre operators, and museum operators were subject to similar physical and operational requirements.  *See id.* § 9009a(a)(1)(A)(iii)–(v); *see also id.* § 9009a(a)(3)–(10).

The SVOG Program limited the use of grant funds.  A grant recipient could use the funds for costs incurred between March 1, 2020 and June 30, 2022.  15 U.S.C. § 9009a(d)(1)(A)(i)–(ii).  Recipients could spend the grant on payroll costs, rent or mortgage payments, utilities, and other "ordinary and necessary business expenses."  *Id.* § 9009a(d)(2)(B)(i)–(viii).  Recipients were prohibited from using the funds to purchase real estate, pay loans that originated after February 15, 2020, or invest or re-lend.  *Id.* § 9009a(d)(3)(A)–(E).  To enforce these prohibitions, the SVOG Program required that the SBA "increase oversight of eligible persons and entities receiving grants."  *Id.* § 9009a(e).  The SVOG likewise required the SBA to create an "audit plan" detailing "policies and procedures . . . for conducting oversight and audits of grants."  *Id.* § 9009a(f).

The Act required the SBA's Office of Disaster Assistance to "coordinate and formulate policies relating to the administration of grants."  15 U.S.C. § 9009a(b)(1)(A).  The SBA took several measures toward that end.  On March 26, 2021, the SBA issued a "Notice of funding opportunity" (SVOG Notice) in the Federal Register.  *See* Notice of funding opportunity, 86 Fed. Reg. 16,270–74 (Mar. 26, 2021).  The SVOG Notice explained the SBA would receive applications under the SVOG Program through its website.  *Id.* at 16,270.

The SBA also issued SVOG Post-Application Guidance (SVOG Guidance) to "answer[] common questions about the SVOG program for applicants."  Shuttered Venue Operators Grant

Post-Application Guidance (July 28, 2021), https://www.sba.gov/document/support-post-application-guidance-svog-applicants (SVOG Guidance Ver. 1); *see also* Shuttered Venue Operators Grant Post-Application Guidance (July 22, 2022), https://www.sba.gov/document/support-post-application-guidance-svog-applicants (SVOG Guidance Ver. 4). The SVOG Guidance explained the SBA's process for receiving, reviewing, and accepting or declining applications.

The SBA required applicants to create an account on the SVOG Application Portal (SVOG Portal) and submit their applications through the SVOG Portal. SVOG Guidance Ver. 4 at 2. The SBA would then review each application to determine if the applicant was eligible for a grant. *Id.* at 2–4. If the SBA approved the application, the applicant's "[a]ward amount [wa]s finalized," and the SBA would issue a Notice of Award/Form 1222. *Id.* at 5. However, "prior to disbursement" of any grant funds, the applicant was required to sign and return the Notice of Award. *Id.* The Notice of Award could also be accompanied by a Form 1222 Addendum, which listed Special Conditions that the applicant must satisfy prior to receiving grant funds. *Id.* The applicant was required to "return [the] properly executed [Notice of Award] and complete any Special Conditions prior to disbursement." *Id.* at 6. After the SBA received the completed Notice of Award, the applicant would "become an Awardee/Grantee and the SBA [would] schedule[] a disbursement of funds." *Id.* If, on the other hand, the SBA declined the application, the applicant would "receive an email and an update in [the] SVOG portal indicating [the applicant is] eligible to submit an appeal." *Id.* at 7.

The SVOG Program provided "specific time periods" for awardees "to incur eligible costs and to charge costs to the SVOG award." SVOG Guidance Ver. 4 at 10. A Notice of Award therefore provided information regarding those deadlines. The "Project Period" defined the

"complete length of time for which funds are available for award making." *Id.* The Project Period lasted from the date the SBA issued the grant until the "[e]nd date for incurring eligible and allowable costs." *Id.* The "Budget Period" defined the "complete length of time . . . to spend award funds on eligible and allowable costs" incurred during the Project Period. *Id.* The Budget Period lasted from the first to the last allowable days to spend award funds. *Id.* The period between the issuance of the Notice of Award and the end of the Budget Period was titled the "Active Grantee Phase" and involved "identifying eligible and allowable expenditures and spending grant award funds." *Id.* at 8. The SVOG Guidance also created a "Closeout Phase," during which an applicant would submit an expense report with records documenting the applicant's SVOG Program expenditures. *Id.* at 12–13.

## II.      **Imaginarium's SVOG Application**

Imaginarium submitted its application to the SVOG Program on April 26, 2021. Transf. Compl. ¶ 52. On July 13, 2021, Imaginarium's application status in the SVOG Portal changed to "Awarded" and listed a grant amount of $1,611,445.16. *Id.* ¶ 54. The next day, the SBA sent an email to Imaginarium stating, "Congratulations once again on your Shuttered Venue Operator's Grant!" *Id.* ¶ 56. The SBA's July 14 email referenced Imaginarium as an "awardee." *Id.* ¶ 57. On July 19 and 26, 2021, the SBA published a list of SVOG grant recipients; Imaginarium appeared on both lists. *Id.* ¶ 59.

On July 30, 2021, the SBA sent another email to Imaginarium stating, "Congratulations! Your Shuttered Venue Operator's Grant is approved." *Id.* ¶ 64. The SBA issued to Imaginarium a Notice of Award, with a Project Period of July 13 to December 31, 2021, confirming a grant amount of $1,611,445.16. *Id.* ¶ 65. The SBA also forwarded several action items required of Imaginarium, such as completing a "Program Assurances" document and watching an

informational video.  *Id.* ¶¶ 64–65; *see also* Mot. at 11–12.  Imaginarium signed and returned the Notice of Award and completed the action items at some point on July 30, 2021.  *Id.* ¶ 67.

Also on July 30 — eight minutes after it sent its "Congratulations" email — the SBA sent Imaginarium another email stating, "SBA has fully reviewed your request for SVOG funding, but additional information and technical corrections are required to confirm your eligibility. Please respond to the Action Item SBA has created for you in the SVOG Portal by 8/14/2021 at 8 PM PT to move your application forward."  Transf. Compl. ¶ 68; Mot. at 12.  Imaginarium requested clarification from the SBA but did not receive a response.  Transf. Compl. ¶¶ 69–71, 76.  Nonetheless, Imaginarium stated it had "endeavored to spend the approved budget amount . . . by the deadline of December 31, 2021."  *Id.* ¶ 73.  Imaginarium hosted the Tampa Bay Comic Convention between July 30 and August 1, 2021, and the Atlanta Comic Convention between August 6 and August 8, 2021.  *Id.* ¶¶ 74–75.

On August 14, 2021, the SBA emailed Imaginarium, stating "You have the option to file an appeal of the decline decision for your SVOG application."  Transf. Compl. ¶ 79.  Imaginarium appealed, "despite having never received an actual denial or explanation providing a substantive basis for the purported denial" of its application.  *Id.* ¶¶ 81–90.  Through its appeal, Imaginarium sought to "substantiate that Imaginarium meets all [eligibility] criteria."  *Id.* ¶ 82.  While its appeal was pending, Imaginarium hosted the Indiana Comic Convention between October 15 and October 17, 2021.  *Id.* ¶ 85.

The SBA denied Imaginarium's appeal on October 27, 2021, and this time provided an explanation for its denial.  Transf. Compl. ¶ 86.  The SBA explained that Imaginarium did not meet the principal business activity definition and did not meet various, unspecified eligibility criteria.  *Id.* ¶ 86.  Subsequently, Imaginarium informed the SBA it intended to file a complaint

in the District of Utah and, as a result, the SBA agreed to continue reviewing Imaginarium's

application. *Id.* ¶¶ 87–88.  Ultimately, on December 14, 2021, the SBA informed Imaginarium

its application "remain[ed] declined." *Id.* ¶ 91.  Specifically, the SBA concluded Imaginarium's

primary business involved hosting and operating comic book conventions, which "feature talks

by comics and entertainment industry speakers, photograph and autograph opportunities, and

retail vending." *Id.* ¶ 93.  In contrast, the Act limited eligibility to live venue operators whose

principal business activity involved organizing, promoting, producing, managing, or hosting "live

concerts, comedy shows, theatrical productions, or other events by performing artists." *Id.*; *see*

15 U.S.C. § 9009a(a)(3)(A).  Although Imaginarium's events sometimes included performances

by musicians or comedians, the SBA concluded that such activities were secondary or

supplemental.  Transf. Compl. ¶ 93.  In its December 14, 2021 final denial of Imaginarium's

application, the SBA also stated it had "erroneously issued [the] Notice of Award" to

Imaginarium. *Id.* ¶ 92.

### III.       <u>Procedural Background</u>

Imaginarium initially filed this action on December 23, 2021, in the United States District

Court for the District of Utah (District of Utah).  *See* Complaint (ECF No. 2).  That original

Complaint alleged three causes of action: (1) breach of contract; (2) promissory estoppel; and (3)

an APA claim that the agency's action was arbitrary and capricious.  *Id.*  The parties began

discovery in April 2022.  *See* ECF No. 15 (Scheduling Order).  On May 24, 2022, the Government

filed a motion to dismiss for lack of subject matter jurisdiction.  *See* ECF No. 16.  On August 1,

2022, the District of Utah granted the Government's motion to dismiss for lack of subject matter

jurisdiction and transferred the case to the United States Court of Federal Claims.  *See* ECF No.

38.  In doing so, the District of Utah held that the SBA's waiver of sovereign immunity did not

apply to the SVOG Program; therefore, it held Imaginarium's breach of contract and promissory estoppel claims belonged in the Court of Federal Claims. *Id.* at 3–7. Furthermore, because the APA waives sovereign immunity "only when there is no other adequate remedy in a court," the District of Utah held that waiver did not apply because Imaginarium's APA claim was redundant to its breach of contract claim. *Id.* at 7–9 (quoting 5 U.S.C. § 704).

The case was transferred from the District of Utah to this Court on October 6, 2022. *See* ECF Nos. 39 & 40. Imaginarium filed its Transfer Complaint in this Court on November 3, 2022. *See* Transf. Compl. Distinct from its original complaint, Imaginarium's Transfer Complaint included only a single breach of contract claim. *See* Transf. Compl. ¶ 24 n.3 (explaining Imaginarium "amended its causes of actions herein to voluntarily omit and dismiss without prejudice its cause of action for promissory estoppel" because this Court "lacks jurisdiction over [promissory estoppel] claims"); *id.* at 25–26. Imaginarium's sole cause of action alleges, "The Notice of Award constitutes a binding and enforceable contract to which the SBA expressly and impliedly agreed." *Id.* ¶ 109. According to Imaginarium, the SBA breached the agreement when it revoked the Notice of Award and withheld grant funds from Imaginarium. *Id.* ¶ 111.

The Government moved to dismiss Plaintiff's Transfer Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *See* Mot. The Government contends the "SBA could not have breached any contract with Imaginarium . . . because no contract required the agency to find Imaginarium eligible for the SVOG program or disburse any funds to Imaginarium." *Id.* at 15. The Government argues, in essence, there was no contract formed between Imaginarium and the SBA. *Id.* at 9.

## <u>APPLICABLE LEGAL STANDARD</u>

To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. At the motion to dismiss stage, this Court must "accept as true the complaint's well-pled factual allegations" but need not "accept the asserted legal conclusions." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019). Dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002); *see also Welty v. United States*, 926 F.3d 1319, 1323 (Fed. Cir. 2019) (citing *Lindsay*). The Court "must consider the complaint in its entirety" as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## <u>DISCUSSION</u>

As noted, the sole cause of action alleged by Imaginarium's Transfer Complaint is one for breach of contract. *See* Transf. Compl. ¶¶ 108–12. Specifically, Imaginarium contends "[t]he Notice of Award constitutes a binding and enforceable contract to which the SBA expressly and impliedly agreed." *Id.* ¶ 109. Imaginarium further alleges that the SBA then "materially breached the Agreement by revoking the Award without explanation and subsequently denying Imaginarium's Appeal." *Id.* ¶ 111. The Government counters that there was "no contract"

formed between Imaginarium and the SBA.  Mot. at 15.

To prevail on a breach of contract claim, Imaginarium must first establish the existence of a contract.[2]  "To prove the existence of a contract with the government, a plaintiff must prove four basic elements: (1) mutuality of intent to contract; (2) offer and acceptance;[3] (3) consideration; and (4) a government representative having actual authority to bind the United States."  *Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1364 (Fed. Cir. 2005); *see also Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003).  These elements apply to both

---

[2] The alleged contract between Imaginarium and the SBA is a "grant."  *See* 15 U.S.C. § 9009a(b)(2) (characterizing SVOG Program awards as "grants").  However, there is no dispute, and the parties agree, that courts "treat[] federal grant agreements as contracts when the standard conditions for a contract are satisfied."  *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see* Mot. at 20; Opp. at 17.

[3] The parties appear to disagree about what the "offer" and "acceptance" would be here.  In its Motion, the Government characterizes the Notice of Award as the "offer."  *See* Mot. at 25 n.8, 29–31.  Under the Government's theory, Imaginarium's execution of the Notice of Award was its "acceptance" of the Government's offer.  *Id.*  The Government thus contends the SBA revoked the offer when, eight minutes after issuing Imaginarium's Notice of Award, the SBA sent another email asking for "additional information and technical corrections" to confirm Imaginarium's eligibility for a SVOG grant.  *See* Mot. at 29–31; *see also* Transf. Compl. ¶ 68.

Imaginarium has a slightly different take.  It contends "Imaginarium's application was an offer that the SBA accepted by issuing a Form 1222 Notice of Award to Imaginarium."  Opp. at 7.  Under Imaginarium's framework, there was no revocation because the contract was formed as soon as the SBA issued Imaginarium's Notice of Award.  *Id.* at 32.  Any potential "revocation" that occurred after the SBA issued the Notice of Award — including the SBA's follow-up email asking for "additional information and technical corrections" — was ineffectual because "[o]nce an offer has been duly accepted, it is fundamental that revocation of the offer is no longer possible."  *Id.* (quoting 1 Williston on Contracts § 5:10 (4th ed.)).

This Court need not resolve the parties' dispute over offer and acceptance, however, because it is immaterial to the resolution of the present Motion; as explained further below, under any theory of offer and acceptance, Imaginarium cannot establish the first required element of contract formation.

express and implied-in-fact contracts.[4]  *See Anderson*, 344 F.3d at 1353 n.3.  Both parties agree

these four elements provide the proper framework for analyzing Imaginarium's breach of contract

claim.  *See* Mot. at 15–16; Plaintiff's Opposition to Defendant's Motion to Dismiss (ECF No. 61)

(Opp.) at 7 (arguing Imaginarium "sufficiently alleged" the four required elements of a contract

with the United States); *id.* at 17; Defendant's Reply in Support of its Motion to Dismiss (ECF

No. 62) (Reply) at 6 ("The parties agree that a plaintiff alleging the existence of a contract with

the Government must prove four basic elements.").

The Government argues Imaginarium's Transfer Complaint "fails to plausibly allege"

three required elements of contract formation: mutuality of intent; unambiguous offer and

acceptance; and a government representative having actual authority.  Mot. at 9, 16.  This Court

agrees with the Government at least with respect to the first element of contract formation —

mutuality of intent to contract — and accordingly need not analyze the remaining elements.  *See*

*Am. Bankers*, 932 F.3d at 1384 (affirming dismissal of contract claim because plaintiff failed to

adequately plead a necessary element).  In sum, Imaginarium cannot prove a contract exists

between it and the SBA because it cannot show mutuality of intent to contract.

Mutuality of intent is "a threshold condition for contract formation."  *Anderson*, 344 F.3d

at 1353.  To establish a mutual intent to contract, a plaintiff must demonstrate an "objective

manifestation of voluntary, mutual assent" to enter a binding contract.  *Id.*; *see also Columbus*

*Reg'l Hosp.*, 990 F.3d at 1339 (concluding first element satisfied by "objective evidence of the

parties' intent to be bound").  There must be "a clear indication of intent to contract . . . for

---

[4]  Imaginarium acknowledges that its express and implied-in-fact contract arguments are
duplicative.  *See* Opp. at 17 n.5 (acknowledging requirements for implied-in-fact contract are the
same as for an express contract and explaining "Imaginarium largely addresses [both theories]
together herein").

concluding that a contract was formed." *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003).

When a plaintiff seeks to enforce an alleged contract against the United States, the plaintiff's intent to contract is rarely in dispute. Rather, the United States' intent to contract is at the forefront of the dispute. *See* Mot. at 17–21 (Government arguing no evidence of the SBA's intent to contract); *Hometown Fin.*, 409 F.3d at 1365 (characterizing dispute as whether there was "objective evidence of the government's intent"); *Am. Bankers*, 932 F.3d at 1384 (concluding the plaintiff "did not plead facts sufficient to establish the government's intent to contract"). Evidence of the United States' intent to bind itself in contract may take several, nonexclusive forms. The United States' intent may be found in the statute and/or regulations enabling the government's conduct with respect to the alleged contract. *See Am. Bankers*, 932 F.3d at 1381–84 (analyzing the Federal Reserve Act for "evidence of the government's intent to contract"); *Columbus Reg'l Hosp.*, 990 F.3d at 1339 (citing FEMA regulations as "objective evidence of the parties' intent to be bound by the agreement"). Other documentary evidence, such as written agreements, can also establish the United States' intent to contract. *See Hometown Fin.*, 409 F.3d at 1365–66 (noting "in particular four documents as evidence of the government's intent to contract"). Regardless, while evidence of the United States' intent to contract often "depends on the surrounding factual circumstances," *id.* at 1365, "there needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." *D & N Bank*, 331 F.3d at 1377.

Imaginarium contends "the SBA made clear its intention to enter a contractual agreement . . . by express words and conduct, including through regulations and policies implementing the SVOG Program's enabling statute and direct communication with Imaginarium." Opp. at 20.

Imaginarium thus relies on several sources that, when viewed in their totality, allegedly reflect a mutual intent to contract between Imaginarium and the SBA under the SVOG Program. Opp. at 17–25. In support of its position, Imaginarium cites the SVOG Program's enabling statute, 15 U.S.C. § 9009a; the SVOG Notice; the SVOG Guidance; and correspondence between the SBA and Imaginarium, including the Notice of Award, as evidence of mutual intent. *Id.* However, none of these sources, even when viewed as a collective, demonstrate the United States' intent to bind itself in contract with Imaginarium under the SVOG Program.

Imaginarium's first contention that the SVOG Program's enabling statute, Section 9009a, provides evidence of the Government's intent to contract, is without merit. It is well-established that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Nat'l R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co.*, 470 U.S. 451, 465–70 (1985) (quoting *Dodge v. Bd. of Educ.*, 302 U.S. 74, 79 (1937)) (holding Rail Passenger Service Act of 1970 did not manifest an intent on Congress's part to bind itself contractually to the railroads). Indeed, "the principal function of a legislature is not to make contracts, but to make laws that establish . . . . policy [and, accordingly, for the judicial branch] . . . . to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body." *Id.* at 466 (citations omitted). Section 9009a is silent as to the SBA's ability to enter into contracts. It simply requires the SBA to "coordinate and formulate policies" for administering the SVOG Program and permits the SBA to "make initial [and supplemental] grants" to eligible entities. 15 U.S.C. § 9009a(b)(1)–(3). There is nothing in the statute that reflects an intent to bind the United States in contract. It does not authorize the SBA

14

to enter into contracts or any other binding arrangements.  Instead, it merely requires the SBA to administer a grant program based on congressionally-defined criteria.  Indeed, Section 9009a stands in stark contrast to other statutory or regulatory provisions courts have found to demonstrate the government's intent to contract.  For example, in *Columbus Regional Hospital*, the relevant regulations described "'FEMA-State Agreements' as 'impos[ing] binding obligations on FEMA [and] States . . . in the form of conditions for assistance which are legally enforceable.'" *Columbus Reg'l Hosp.*, 990 F.3d at 1339 (citing 44 C.F.R. § 206.44(a)).  The regulations in *Columbus Regional Hospital* indicated, through express terms, that the government intended to enter binding contracts. *Id.*  Section 9009a does not include similar expressions of intent.  Section 9009a is closer to the statutory language in *American Bankers* that the Federal Circuit found to be "devoid of the traditional indicia of a contractual undertaking." *Am. Bankers*, 932 F.3d at 1382.  There, the relevant statute did not "speak of a contract" nor "provide for the execution of a written contract on behalf of the United States." *Id.* (quoting *Nat'l R.R. Passenger Corp.*, 470 U.S. at 467).  Instead, the statute simply "set[] forth a regulatory system." *Id.*  So too here; Section 9009a simply outlines a framework the SBA must use to issue monetary grants to eligible entities.  The SVOG Program's governing statute therefore does not provide any evidence of the United States' intent to contract.

Imaginarium, perhaps conceding the point, does not cite to any particular provision in Section 9009a as evincing intent to contract.  Instead, Imaginarium relies primarily on "other clear evidence."  Opp. at 24.  However, this "other evidence" does not demonstrate "a clear indication of intent to contract" either. *D & N Bank*, 331 F.3d at 1378.  Imaginarium first points to the SVOG Notice in support of its contention.  The SVOG Notice, however, likewise lacks evidence of the SBA's intent to enter contracts on behalf of the United States.  The SVOG Notice

"invit[ed] applications for new awards" pursuant to the SVOG Program.  *See* 86 Fed. Reg. 16,270. It simply provided relevant dates for applicants, *see id.*; summarized the content of the SVOG Program, *see id.* at 16,270–73; publicized application and submission instructions, *see id.* at 16,272–73; and gave information regarding the SBA's application review process, *see id.* at 16,273–74.  The SVOG Notice is "devoid of the traditional indicia of a contractual undertaking" that could reflect the United States' intent to enter into a contract. *Am. Bankers*, 932 F.3d at 1382. The SVOG Notice does not provide evidence of the United States' intent to enter contracts with grant recipients and, accordingly, does not support Imaginarium's claim.

Imaginarium's reliance on the SVOG Guidance suffers the same flaws.  The SVOG Guidance is essentially a guideline for applicants that "answers common questions about the SVOG [P]rogram."  SVOG Guidance Ver. 4 at 1.  The SVOG Guidance explains what to expect while an application is under review and after a decision has been rendered.  *Id.* at 3–8.  The SVOG Guidance also details the post-approval process, including the "Active Grantee Phase" — which involves "identifying eligible and allowable expenditures and spending grant award funds" — and the "Closeout Phase" — which involves documenting expenditures and submitting recordkeeping documents to the SBA.  *Id.* at 8–13.  Despite Imaginarium's claims, the SVOG Guidance does not contain any statements suggesting the SBA intended to contract with grant recipients.  The SVOG Guidance appears to reflect the SBA's effort to "coordinate and formulate policies relating to the administration of grants," as the SVOG Program required.  15 U.S.C. § 9009a(b)(1)(A).  Creating administrative procedures and policies to implement the SVOG Program is not objective evidence of the SBA's intent to enter binding contracts.  *See Chattler v. United States*, 632 F.3d 1324, 1330 (Fed. Cir. 2011) ("[S]tatements of information or definition are not statements of obligation.").

Imaginarium finally references the Notice of Award and the SBA's "direct communication with Imaginarium" as evidence of intent to contract.  Opp. at 20.  This Court disagrees with Imaginarium's characterization of the Notice of Award and other SBA communications.  The Notice of Award includes important information regarding Imaginarium's "grant," including the Project Period, Budget Period, and Award Amount, among other information.  *See* Mot. at 38 (Ex. C).  However, this information would be included in any grant document and does not necessarily indicate an intent to contract.  Indeed, the face of the Notice of Award states its purpose is "to notify grant recipients of award reporting and record keeping requirements." *Id.*  The Notice of Award is just that: an informational notice.  It does not establish mutual obligations owed by each party, nor does it contain any other indications of intent to bind the United States to contract.  The Notice of Award is more akin to a regulatory approval document than a manifestation of assent to a binding contract.  *See Am. Bankers*, 932 F.3d at 1384 (evidence of alleged express contract insufficient where it "merely states that [plaintiff's] application and payment have been processed" and is more a "statement of policy based on [the statute] . . ., not the language of a promise or contractual undertaking").

Furthermore, the SBA's "direct communications" with Imaginarium appear to be notifications alerting Imaginarium — erroneously — that its application was approved.  *See* Opp. at 22–23 (listing "communications . . . indicating that [Imaginarium's] Application was approved").  Without explanation, Imaginarium asserts these communications "constitute objective evidence that the SBA and Imaginarium intended to enter into the contractual grant agreement."  Opp. at 23.  These errant communications do little to advance Imaginarium's argument.  The communications are not framed within the context of a binding contract, and there is simply nothing in the communications that indicates the SBA intended to contract with

Imaginarium.   Imaginarium's conclusory reliance on these communications underscores the overall dearth of evidence supporting an SBA intent to contract.  *See* Opp. at 22–23.

Imaginarium's primary argument is that the SVOG Program and the SBA imposed rules on applicants — such as eligibility requirements, spending limitations, and recordkeeping procedures — and those rules indicate the SBA's intent to contract.  *See* Opp. at 22.  For example, Imaginarium argues "the SBA and Imaginarium demonstrated mutual intent to contract through their common reliance on the grant-agreement terms . . . and by manifesting an intent to ensure each other's compliance with the terms."  *Id.*  According to Imaginarium, the SBA indicated its intent to contract by enforcing "eligibility and application requirements," defining "allowable and restricted uses of funds," and mandating "auditing, monitoring, reporting, and documentation requirements."  *Id.*  And Imaginarium asserts that by agreeing to be bound by those terms in exchange for a grant, it likewise indicated its intent to contract.  *Id.*

Imaginarium's argument is not persuasive.  Under Imaginarium's theory, if a federal agency promulgates rules to govern a program or initiative, such rules would be *prima facie* evidence of the agency's intent to enter binding contracts.  This is untenable and would be counterproductive to agencies' efforts to administer federal programs.  Not surprisingly, Imaginarium does not reference a single case finding an intent to contract based solely on an agency's adoption of rules or guidelines.  Imaginarium's theory also misses the purpose of the mutual intent requirement, which is to confirm both parties understand and assent to a binding contract.  *See* Restatement (Second) of Contracts § 18 (1981); *Anderson*, 344 F.3d at 1353.  Furthermore, "a statute does not create contractual obligations merely by setting forth 'benefits to those who comply with its conditions.'"  *Am. Bankers*, 932 F.3d at 1383 (quoting *Wis. & Mich. Ry. Co. v. Powers*, 191 U.S. 379, 387 (1903)).  Accordingly, the mere fact that SVOG grantees

must comply with certain requirements as a condition of a grant does not mean that the United States has somehow manifested its intent to contract.  "[S]omething more is necessary;" but here, "the government's intention to be bound is nowhere to be found."  *D & N Bank*, 331 F.3d at 1378–79.

The only case Imaginarium cites to support its mutuality of intent argument is *Thermalon Industries, Ltd. v. United States*.  34 Fed. Cl. 411 (1995); *see also* Opp. at 18–20, 22.  However, *Thermalon* is easily distinguishable from the present case in a crucial respect.  In *Thermalon*, the Court of Federal Claims analyzed a breach of contract claim regarding the plaintiff's "work under a research grant from the National Science Foundation (NSF)."  *Thermalon*, 34 Fed. Cl. at 413.  The court determined "the parties' mutual intent to enter a contract [was] demonstrated by each party's dependency on the other's compliance with the terms of the grant agreement."  *Id.* at 415.  Notably, however, the applicable statute at issue in *Thermalon*, 42 U.S.C. § 1870(c), specifically "authorized the NSF to enter into contracts to promote scientific activities," indicating a clear intent to bind the United States in contract.  *Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 791 (2001).  Specifically, there the NSF had awarded plaintiff a grant "pursuant to NSF's authority under the National Science Foundation Act of 1950 . . . which authorize[d] NSF to promote scientific activities by entering 'contracts or other arrangements.'"  *Id.* at 413 (quoting 42 U.S.C. § 1870(c)).  As discussed, such an unequivocal expression of intent is absent from the SVOG Program's enabling statute, 15 U.S.C. § 9009a, or any other official SBA source.  *Thermalon* is therefore inapposite to Imaginarium's argument.  *See Pa. Dep't of Pub. Welfare*, 48 Fed. Cl. at 791 (observing "[t]he present case is distinguishable from *Thermalon*" because "[h]ere, there is no statue authorizing [the agency] to enter into a contract").

It is well-established that "[t]he government may implement statutorily mandated subsidy

programs without employing contracts as a vehicle for doing so." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021); *see also Thermalon*, 34 Fed. Cl. at 421 ("[T]he government always has the choice when designing a grant scheme to select a scheme that does or does not involve contracts."). The SVOG Program is clearly one such program that does not employ contracts. This is demonstrated by the lack of intent to contract reflected in any statute, regulation, or other SBA documents or communications concerning the SVOG Program. Imaginarium may — perhaps rightly — feel misled by the SBA's poor handling of Imaginarium's application and initial, mistaken representation that the application was approved, and an award would be forthcoming. But despite this valid frustration, Imaginarium cannot bypass the legal requirement to demonstrate a mutual intent to contract. *See Hometown Fin.*, 409 F.3d at 1364; *Anderson*, 344 F.3d at 1353. Imaginarium's remedy, to the extent one exists, does not sound in breach of contract in this Court.[5]

Imaginarium cannot "satisfy its burden to prove . . . a mutuality of intent" to contract. *Anderson*, 344 F.3d at 1353. As Imaginarium's Transfer Complaint does not — and cannot — plausibly satisfy one of the required elements of a contract, it cannot establish the existence of a contract with the United States as a matter of law. Imaginarium's breach of contract cause of

---

[5] In the District of Utah, Imaginarium asserted a claim under the APA alleging that Defendant acted arbitrarily and capriciously in declining to award Imaginarium a grant while approving grant applications for similar businesses. *See* Complaint (ECF No. 2) at ¶¶ 117–26 (alleging the SBA "treat[ed] Imaginarium disparately from similarly situated businesses that were granted SVOG awards"). Imaginarium also asserted a promissory estoppel claim in the District of Utah. *See id.* ¶¶ 110–16. Those claims are not before this Court. During the April 11, 2023 oral argument, Imaginarium confirmed the only claim present in this action is Imaginarium's breach of contract claim and that Imaginarium did not assert its promissory estoppel and APA claims in its Transfer Complaint. *See also* Transf. Compl. ¶ 24 n.3 (explaining Imaginarium "voluntarily omit[ted] and dismiss[ed] without prejudice its cause of action for promissory estoppel"); *id.* n.4 (Imaginarium reserving its right to "bring or appeal its APA Claims and/or its claims for promissory estoppel . . . at a later time"); *id.* at 25–26 (Transfer Complaint including only breach of contract cause of action).

action therefore fails to state a claim upon which relief can be granted.  *See Am. Bankers*, 932 F.3d at 1384 ("Because [plaintiff] did not plead facts sufficient to establish the government's intent to contract, the complaint fails to state a plausible claim for breach of contract.").

## **CONCLUSION**

For the reasons explained, Defendant's Motion to Dismiss for Failure to State a Claim (ECF No. 60) is **GRANTED**.  Imaginarium's Transfer Complaint (ECF No. 48) is **DISMISSED** pursuant to Rule 12(b)(6).  The Clerk of Court is **DIRECTED** to enter Judgment accordingly.


IT IS SO ORDERED.

*Eleni M. Roumel*
ELENI M. ROUMEL
Judge


June 7, 2023
Washington, D.C.